Jones, Chief Judge,
delivered the opinion of the court:
This case comes to us pursuant to House Resolution 734, 81st Congress, 2d Session, which reads as follows:
*711 Resolved, That the bill (H. R. 5243) entitled “A bill for the relief of Otho F. HipMns, individually, and Otho F. HipMns; Cecil Clyde Squier; Conrad Reid; J. Thomas C. HopMns, Junior; and Isaiah Lawrence Paxton, as trustees of the HipMns Traction Device Company,” now pending in the House of Representatives, together with all accompanying papers, is hereby referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of said sections and report to the House, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimants.
Plaintiffs’ original petition was based upon three patents which were issued to Otho F. HipMns.
The referred bill was in two parts. The first part related to services performed and expenses incurred by the plaintiff. Otho F. HipMns and the HipMns Traction Device Company.
The second part of the bill deals with the alleged unauthorized use by the Government of traction devices invented by Otho F. HipMns and the infringement of Letters Patent Nos. 1,600,588,1,600,589 and 2,008,210.
All three patents involved a traction device which would operate on trucks and other mobile veMcles in a somewhat similar manner to the way in which a caterpillar track is operated on a caterpillar tractor. The device involved here was intended to enable the faster and more mobile vehicles to operate satisfactorily on wet or sandy terrain.
We will deal with the second part of the bill first.
After the taking of the testimony in the case was completed the plaintiffs on June 16, 1952, filed a motion to dismiss the petition in part. The motion was as follows:
In view of the small procurement of traction devices by the Government during the life of the first two patents in suit, plaintiffs, by and through their attorney, move to dismiss the petition insofar as it requires (a) a report to Congress and (b) judgment by this court on any unauthorized use of any claims of United States *712 Letters Patent Nos. 1,600,588 and 1,600,589 under U. S. C., Title 28, Section 1498.
This motion was granted. Consequently this portion of the discussion of the referred bill will relate primarily to the last patent in suit, No. 2,008,210. Application for this particular patent was filed August 12, 1933 and the patent thereon issued July 16, 1935.
The first two patents mentioned above were assigned by Hipkins to the Hipkins Traction Device Company. • The last mentioned patent was not assigned and remained the property of Otho F. Hipkins. As originally filed the last application for a patent contained various forms of structural claims. However, when the patent was issued it was specifically limited to certain structural features of an adjustable coupling shoe by means of which the length of the traction device around the wheels could be adjusted.
A detailed description of the traction device is set out in findings 23 to 28, inclusive.
The alleged infringing structure was manufactured by Alliance Engineering, Inc., of Alliance, Ohio, pursuant to contracts entered into by that company with the defendant through the Office of the Chief of Ordnance of the War Department. A description of the alleged infringing structure is set out in detail in findings 29 to 32, inclusive.
A comparison of the description and illustrations of the Alliance structure with the phraseology of the claims of the Hipkins patent No. 2,008,210 as actually granted demonstrates clearly that there is little similarity in the shoes or locking devices of the two structures which was the part of the traction device that was covered by the last Hipkins patent. Consequently there is no infringement of the patent by the accused device.
PRIOR ART
A British patent that was issued to Kennedy on March 23, 1933, a description of which is set out in finding 36, is for the same function and very similar in construction to that claimed in the last Hipkins patent. When contemplated in view of the prior art as explained in detail in finding 37, all the *713 claims are anticipated except claim 3, which is quite limited in scope, and not infringed.
There is no proper basis for holding that the Government through the Alliance contracts utilized the subject matter of the Hipkins patent No. 2,008,210 as covered by the patent actually issued.
THE IMPLIED CONTRACT
Plaintiffs also present a claim for alleged authorized use of the invention covered by the three Hipkins patents in suit in connection with traction devices procured by the Government from other than the Hipkins Traction Device Company with special reference to the traction devices purchased by the Government under five contracts with the Alliance company. These are listed in detail in finding 29.
Plaintiffs base this claim largely upon the conversation they claim took place between Otho F. Hipkins and Major Wallace some time in May 1930. They assert that this discussion resulted in a verbal understanding that the Government would either adopt the Hipkins traction device and purchase them from Hipkins or enter into a license agreement under the three patents in suit. Major Wallace died before the trial of the case.
There is no evidence which corroborates Hipkins as to tbis understanding and there is no evidence that Major Wallace had any authority to bind the Government in an agreement to purchase the Hipkins traction device.
Plaintiffs also rely upon a conversation which they claim Hipkins had with General Bishop, Chief of Field Artillery, in the early part of 1931, in which he quoted General Bishop as stating at the conclusion of the test that he was thoroughly convinced and satisfied that the use of the Hipkins traction device on the wheels of a commercial vehicle would materially increase its cross-country mobility and that there was no question in his mind that it could be considered as satisfactory as a light prime mover and a cargo vehicle for light Field Artillery purposes. General Bishop is also deceased, and there is no further evidence of this conversation, nor is there any evidence in the record that any Government agent with authority to bind the Government contractually guaranteed *714 Hipkins that his device woidd be purchased in quantities other than those specified in the seven contracts entered into by the Government with the Hipkins Company and described in detail in finding 16.
On April 14,1932, Hipkins assigned to the Hipkins Traction Device Company the first two patents involved in this suit. The only interest which he retained was as a stockholder and officer of the Hipkins Company.
On August 22,1934, the Hipkins Traction Device Company granted to the Lukens Steel Company an exclusive license until December 31,1945, to make, use and sell traction devices. The only exception to this exclusive license agreement was a reservation by the Hipkins Company to manufacture and sell no more than 3,000 sets of traction devices to the Government.
The last directors’ meeting of the Hipkins Company was held in June 1936 and Hipkins reentered Government employment on August 1,1936. There is no evidence showing any activity on the part of the Hipkins Company after that date. On August 23,1939, the Governor of the State of Maryland, by proclamation, annulled the charter of the Hipkins Traction Device Company for nonpayment of Maryland State taxes. As is set out in finding 38, the Government did not use any of the inventions forming the subject matter of the claims of Hipkins patent No. 2,008,210.
PART ONE OF THE REFERRED BILL

Olairn for Services and Expenses

The plaintiff Hipkins alleges that he gave approximately six and one-half years of his personal time valued at $3,000 a year, or a total of $19,500, and spent approximately $17,500 in cash for equipment and in defraying expenses in demonstrating the Hipkins traction device to United States Army officials, and that after the Hipkins Traction Device Company was organized he spent three years of his time as president of that company, valued at $4,000 a year, or $12,000, and approximately $25,000 in cash of the Hipkins Traction Device Company’s money as expenses in demonstrating the Hipkins traction device and in training Army personnel in its practical use and application.
*715 For ease in consideration of this case, the claim for services and expenses has been divided into two periods. Period “A” extends from September 30, 1926, when Hipkins left the employment of the Government and organized the Hipkins and Paxton garage, to April 14, 1932, when the Hipkins Traction Company was incorporated and Hipkins became its president. Period “B” extends from the date of incorporation of the Hipkins Company until August 1, 1936, when Hipkins became reemployed by the Government.
During period “A” Hipkins became a partner in the garage business and engaged in the sale of various makes of automobiles and automobile accessories. Hipkins was owner and manager and received an income from the partnership (see finding 7, to which plaintiffs took no exceptions). Hip-kins’ estimate of annual income from this business was approximately $2,000 as indicated on defendant’s exhibit 86. Hipkins’ first contact with the Government was at a conference with Major "Wallace at Aberdeen Proving Ground about May 1,1930, and on July 1, 1930, Hipkins demonstrated one of his traction devices (see findings 8 and 10). The only period, therefore, for which Hipkins could be reimbursed for personal services and expenses in making tests and demonstrations for the Government would extend from May 1, 1930, to April 14,1932. The total period of time is approximately two years (actually one year, eleven months and thirteen days). Hipkins kept no record of either the time or the expenses involved but now estimates that he carried on demonstrations and tests for the Government once or twice a week (see finding 19, to which plaintiffs have taken no exception).
Using Hipkins’ own present estimate, which when averaged becomes one and one-half days a week, this would indicate a total of approximately 150 days’ tests and demonstrations for period “A”. In this connection, attention is directed to the first Government report dealing with a test of the Hipkins device at Aberdeen. This document is entitled “First Partial Beport on Test of Ford 1%-Ton Truck Equipped With the Hipkins Traction Device.” This report refers to tests of the Hipkins device in June, July and September of 1931, and indicates a total test period of 12 days, *716 which represents a considerable variance from Hipkins’ present estimate (see finding 12).
The next Government report in evidence is plaintiffs’ exhibit 32, dated August 30, 1932, and is entitled “Second Partial Report on Hipkins Traction Device.” This report refers to a test held for five days in June of 1932, which occurs in period “B”, after the incorporation of the Hipkins Company.
Any claim for personal services rendered and expenses incurred by Hipkins as an individual accrued to him by April 14, 1932, when he became president of the Hipkins Company. Such claim was barred by April 14, 1938, by operation of the statute of limitations (see finding 21).
There is nothing in the present referred bill that waives the statute of limitations, and a report to Congress under section 2509, Title 28, United States Code, would have to suggest that any amount to be given to Hipkins individually would be a gratuity, or the recognition of a moral obligation. There is no record of expenses incurred by Hipkins.
Period “B” begins April 14, 1932, with the incorporation of the Hipkins Company and the assignment of certain patents thereto by Hipkins. As stated in finding 13, to which plaintiffs made no objection, the major purpose of the Hip-kins Company was to sell traction devices to the Government and others.
On August 22,1934, the Hipkins Company granted to the Lukens Steel Company an exclusive license until December 31, 1945, to make, use, and sell traction devices, reserving to the Hipkins Company the right to manufacture and sell not exceeding 3,000 sets of traction devices to the United States Government. This license agreement was assigned to the By-Products Steel Corporation of Coatesville, Pa., and royalties were paid to the Hipkins Company during this period at the rate of 10 to 20 percent of the net selling price. From October 1934 to December 1935, Hipkins was employed on a full-time basis by the By-Products Steel Corporation at an annual salary of $3,250. During this period of employment Hipkins did not demonstrate any traction devices nor make any tests for the Government. After Hipkins left the By-Products Steel Corporation he did not perform any serv *717 ices or incur any expense in connection with demonstrations or tests relative to traction devices for the Government, and there is no evidence that any of the plaintiffs or anyone else representing the Hipkins Company, other than Hipkins, at any time performed any services or incurred any expense in connection with tests and demonstrations of traction devices for the Government. (See finding 15, to which plaintiffs have made no objection.) See also the following sentence quoted from finding 19, to which plaintiffs have taken no exception:
The only time that Hipkins made any demonstrations in period “B” was from April 14,1932, when the Company was incorporated, to October 1934, when he became a full-time employee of the By-Products Steel Corporation, a total period of approximately two years and six months.
During the existence of the Hipkins Company the Government entered into seven supply contracts with it for traction devices, the contracts totalling 708 unit sets at a total price of $46,997.70. These are tabulated in finding 16, and all the traction devices called for in the contracts were delivered to defendant, and the Hipkins Company received full payment for them under the terms of the contracts. The Hipkins Company was therefore not only receiving royalties from its licensee but was manufacturing for the Government as well. The Hipkins Company during its life kept records of expenses and costs but such records have all either been lost or destroyed (see finding 19, to which plaintiffs have taken no exception).
Under these circumstances, it appears that the Hipkins Company would have no claim for services performed and expenses incurred for the Government. The demonstrations and tests on behalf of the Hipkins Company ceased in October 1934, when Hipkins became employed by the By-Products Steel Corporation. Any alleged claim was barred in October 1940 by the statute of limitations.
*718 While we find that there was no legal obligation on the part of the Government to pay for the services rendered and to reimburse plaintiff Otho F. Hipkins for the expenses incurred ; and while it is conceded that he was in the employ of the Government when the first two patents were applied for and granted; and while it is apparent from the record that his patents were not infringed by the Government’s .contracts, nevertheless we believe, upon consideration of the entire record, that the defendant received substantial benefits from the work and efforts of plaintiff Hipkins.
There is no doubt that there was a need on the part of the Army for a practical traction device for mobile vehicles. Plaintiff Hipkins constructed a traction device. There were a number of demonstrations at proving grounds. Some officials were interested. At one time the Chief of Ordnance asked plaintiff Hipkins to bring a section of the device to show him.
From this information and from information gained from other sources the defendant drew specifications for a traction device which it desired.
Practical devices are usually a matter of gradual development. We have no doubt that in fairness to plaintiff Hipkins he should be compensated for at least a part of his work while not in Government service and for the expense he incurred in making the demonstrations.
Unfortunately Hipkins kept no record either of the time or personal expenses involved. He made an estimate of the time he spent and the expense incurred, but the evidence on this point is not wholly satisfactory. During most of the period when he was not in Government service plaintiff Hip-kins was engaged as a partner in the garage business or was working on a salary basis for the Hipkins Traction Device Company. Whatever is paid him would be in the nature of a jury verdict based on a consideration of the entire record.

Recommendation

On the basis set out in the preceding paragraph we recommend to the Congress that the plaintiff Otho F. Hipkins be *719 paid the sum of $5,000. This suggestion is addressed entirely to the discretion of the Congress.
Howell, Judge; Madden, Judge; Whitaker, Judge; and Littleton, Judge, concur.
FINDINGS OF FACT
The court makes findings of fact, based upon the evidence, the report of Commissioner Hayner H. Gordon, and the briefs and argument of counsel, as follows:
1. There are two different phases of this case. In one phase the Court of Claims is authorized to make a report to the House of Representatives as provided in 28 TJ. S. C. 1492 and 2509. In the other phase the Court of Claims is requested by the plaintiffs to enter a judgment against the defendant.
The first phase is based on a bill introduced in the House of Representatives on June 20, 1949 (H. R. 5243, 81st Congress, 1st Session). This bill reads as follows:
For the relief of Otho F. Hipkins, individually, and Otho F. Hipkins; Cecil Clyde Squier; Conrad Reid; J. Thomas C. Hopkins, Junior; and Isaiah Lawrence Paxton, as trustees of the Hipkins Traction Device Company.
Be it enacted by the Senate and House of Representar Uves of the United States of America in Congress assembled, That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to Otho F. Hipkins, individually, and Otho F. Hipkins; Cecil Clyde Squier; Conrad Reid; J. Thomas C. Hopkins, Junior; and Isaiah Lawrence Paxton, as trustees of the Hipkins Traction Device Company, the sum of $490,000. The payment of such sum shall be in full settlement of all claims of the said Otho F. Hipkins and the Hipkins Traction Device Company against the United States arising out of (1) services performed and expenses incurred by Otho F. Hipkins and the Hipkins Traction Device Comgany pursuant to verbal instructions of officers of the •rdnance Department of the Army in connection with the planning and development of traction devices suitable for use on wheels of motor trucks and (2) unauthor *720 ized use made by the War Department, Navy Department, and Marine Corps prior to and during World War II of the traction devices invented by the said Otho F. Hipkins and the Hipkins Traction Device Company and infringement of Letters Patent Numbered 1,600,588, 1,600,589, and 2,008,210.
Following the introduction of the above bill, the House on August 25, 1950, approved a resolution referring the above bill to the Court of Claims for a report (H. Res. 734, 81st Congress, 2d Session). This resolution reads as follows:
Resolved, That the bill (H. R. 5243) entitled “A bill for the relief of Otho F. Hipkins, individually, and Otho F. Hipkins; Cecil Clyde Squier; Conrad Reid; J. Thomas C. Hopkins, Junior; and Isaiah Lawrence Paxton, as trustees of the Hipkins Traction Device Company,” now pending in the House of Representatives, together with all accompanying papers, is hereby referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of said sections and report to the House, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimants.
By letter dated September 8,1950, the Clerk of the House of Representatives transmitted a certified copy of the above bill to the Court of Claims.
On September 11, 1950, the Court of Claims received the above bill and resolution, and on November 1, 1950, the plaintiffs filed their petition in this case. The petition has annexed thereto as Appendix B the Judiciary Committee report, No. 2755, 81st Congress, 2d Session, made in connection with the resolution referring this matter to the Court of Claims.
2. The referred bill is in two parts. Part 1 relates to services performed and expenses incurred by plaintiff Otho F. Hipkins and the Hipkins Traction Device Company.
*721 At the pretrial conference before the Commissioner on November 5, 1951, plaintiffs amended the petition as to the parties as follows:
Cecil Clyde Squier, Conrad Reid, J. Thomas C. Hopkins, Jr., Isaiah Lawrence Paxton, George K. Hip-kins, Frederick L. Cobourn and Caroline W. Stump, Administratrix of the estate of Cecil Clyde Squier, deceased, insofar as they appear as individual party plaintiffs, should be dropped, and this action should proceed in the names of Otho F. Hipkins, individually, and Otho F. Hipkins, Conrad Reid, J. Thomas C. Hopkins, Jr., and Isaiah Lawrence Paxton, Trustees of the Hipkins Traction Device Company, the real parties in interest. [Pretrial memorandum filed November 6, 1951, paragraph 3, item C.]
The second part of the referred bill deals with the unauthorized use by the Government of traction devices invented by Otho F. Hipkins and the Hipkins Traction Device Company, and the infringement of Letters Patent Nos. 1,600,588, 1,600,589, and 2,008,210.
After proof was closed in this case, plaintiffs on June 16, 1952, filed a motion to dismiss the petition in part. This motion is quoted below:
In view of the small procurement of traction devices by the Government during the life of the first two patents in suit, plaintiffs, by and through their attorney, move to dismiss the petition insofar as it requires (a) a report to Congress and (b) judgment by this court on any unauthorized use of any claims of United States Letters Patent Nos. 1,600,588 and 1,600,589 under U. S. C., Title 28, Section 1498.
Pursuant to this motion the Court on July 15, 1952, issued the following order:
The plaintiffs herein having filed on June 16, 1952, a motion to dismiss the petition in part, and the defendant having consented on June 17,1952, to the entry of an order dismissing the petition in this case to the extent sought by plaintiffs’ motion to dismiss in part, and, on consideration thereof,
It is ordered this fifteenth day of July 1952, that plaintiffs’ said motion to dismiss in part be and the *722 same is allowed and the petition is dismissed insofar as it requires a report to Congress and a judgment by this Court on any unauthorized use of any claims of United States Letters Patent Nos. 1,600,588 and 1,600,589 under U. S. C., Title 28, Section 1498.
FART ONE OF THE REFERRED BILI*

Claim for Services and Empernes

3. Throughout the period from March 13,1919, to September 30, 1926, Otho F. Hipkins was continuously employed by the defendant as a vehicle driver and repairman at the Aberdeen Proving Ground, Aberdeen, Maryland, Ordnance Department (War Department). He was employed as a tractor driver and drove vehicles for test purposes.
On August 1, 1936, Hipkins reentered the employment of defendant and from then until August 4, 1942, he was a civilian employee. On August 5, 1942, Hipkins was called to active duty as a Captain in the United States Army. He was on active duty as an officer until August 12,1947. Since that date Hipkins’ status has continuously been that of a Major, United States Army, retired.
4. The plaintiff Hipkins alleges that he gave approximately six and one-half years of his personal time valued at $3,000 a year, or a total of $19,500, and spent approximately $17,500 in cash for equipment and in defraying expenses in demonstrating the Hipkins traction device to United States Army officials, and that after the Hipkins Traction Device Company was organized he spent three years of his time as president of that company, valued at $4,000 a year, or $12,000, and approximately $25,000 in cash of the Hipkins Traction Device Company’s money as expenses in demonstrating the Hipkins traction device and in training Army personnel in its practical use and application.
5. Period “A.” Any claim for individual services and expenses on behalf of Hipkins is limited to the interval between September 30, 1926, when Hipkins left the employment of the Government, and April 14, 1932, when the Hipkins Traction Device Company at Port Deposit, Mary-
*723 land, was incorporated, and Hipkins became its president, a period of approximately five and one-half years.
Period liB” Any claim for services and expenses on behalf of the Hipkins Company is limited to the period beginning April 14, 1932, the date of its incorporation, and extending to August 1, 1936, at which time Hipkins was reemployed by the Government.
There is no evidence of any tests or demonstrations made by the Hipkins Traction Device Company for the Government other than those made by its president, Hipkins.
6. Before considering in detail the pertinent facts of this case occurring in the periods just referred to it appears advisable to have some understanding of the general type of structure involved and which has been generally referred to as a traction device. In general, these are devices adapted to be applied to vehicle wheels for improving their tractive engagement with the ground, thus minimizing slippage of the wheels, especially when the ground is wet or sandy. Skid chains such as are commonly used today on automobile wheels are typical forms of traction devices.
A form of traction device approximating those which Hipkins and Ms company were worMng with is shown in the TJmted States patent to Weed issued July 20, 1915 (defendant’s exMbit 61). Figs. 1, 2, and 3 of tills patent are reproduced herewith. As shown in these drawings and described in the Weed specification, tMs structure is applicable to a wheel having dual tires (see Fig. 3). The structure consists of a series of shoes 5 or gripping elements mounted on the periphery of the dual tires, each shoe extending across and engaging the surface of each tire tread. These shoes are connected to each other by a series of links 7 centrally located in the space between the two tires, these links also extending around the periphery of the wheel. One of the links 8 is divided, the two inner ends thereof being threaded and engaging an adjusting nut by means of wMch the peripheral length of the traction device may be adjusted and slack taken up, and in addition, if the nut is completely loosened, tMs provides for a disconnection of the traction device and its removal from the wheel.

*724

*725

7. Referring now in detail to period “A” as set forth in finding 5, when Hipkins left the employment of the Government on September 30, 1926, he became a partner in a garage business known as “Hipkins & Paxton.” This partnership had a place of business in Port Deposit, Maryland, with branch offices at Elkton, Rising Sun, and Perryville, Maryland. This partnership engaged in the sale of Nash, Star, and Chrysler automobiles, and the sale of automobile accessories, tires and tubes. The partnership also serviced automobiles. Hipkins was owner and manager and received an income from the partnership.
This partnership extended through period “A” and into a portion of period “B,” terminating in November 1934.
For at least six months after Hipkins left the employment of the Government, Hipkins was busy establishing the garage business, and in this period did nothing with the development of traction devices.
8. Hipkins’ first conference with a representative of the Government relative to traction devices occurred at Aberdeen Proving Ground about May 1, 1930. This conference was with a Major Wallace, who was then an officer of the *726 Field Artillery and stationed at the Aberdeen Proving Ground as Field Artillery representative with the Ordnance Department of the Army. 'Major Wallace was relieved from this assignment on June 15,1932, and assigned to duty in the office of the Field Artillery, and on June 18, 1932, entered on duty as Chief, Materiel Section, Office of the Chief of Field Artillery, Washington, D. C. In connection with this latter tour of duty, he was detailed to Aberdeen' Proving Ground, Maryland; Fort Bragg, North Carolina; Fort Sill, Oklahoma; Fort Riley, Kansas, and Headquarters, 3d Corps Area, with duties as follows: witnessing tests of Field Artillery prime mover and carriages; witnessing a test by the Field Artillery Board of Field Artillery materiel; conference relating to Field Artillery materiel; conference with the Commandant, Field Artillery School, relating to test of truck-drawn 75-mm. gun battalion and observation of truck-drawn Field Artillery in maneuvers and exercises.
According to Hipkins, he reached a verbal understanding with Major Wallace that if tests and demonstrations of the Hipkins traction devices were satisfactory to Major Wallace and the then Chief of Field Artillery, Maj. Gen. Harry G. Bishop, the defendant would either adopt the Hipkins traction devices and purchase them from Hipkins or enter into a license agreement under certain Hipkins patents.
Major Wallace died prior to the trial of this case and there is no evidence that corroborates Hipkins as to his understanding with Major Wallace.
There is no evidence that Major Wallace at any time was a member of the Field Artillery Board or had any authority to bind the defendant by any contract, express or implied, for compensation for any services or for any expenses incurred in tests or demonstrations of the Hipkins traction devices, or for the purchase of any Hipkins traction devices.
9. Between May 1 and July 1,1930, Otho F. Hipkins purchased a 1%-ton Ford truck with dual pneumatic tires, a Warford transmission, and an oversized cooling fan. The Warford transmission was installed in the truck to enable a truck driver to operate the truck over a variety of terrain without stalling the engine by giving it seven speeds forward and two speeds in reverse. The oversized cooling fan *727 was installed in the truck to keep the motor from overheating when running at low speeds across country with heavy loads. This truck remained the property of Hipkins.
10. On or about July 1,1930, Hipkins demonstrated one of his traction devices on the above-described truck to Major Wallace at Aberdeen Proving Ground. He also conducted demonstrations and tests of his traction device for other Army officers at Aberdeen Proving Ground and elsewhere.
11. On August 15,1931, Major Wallace forwarded a memorandum to the Chief of Field Artillery, Washington, D. C. This memorandum, which is entitled “Ford Truck With Hip-kins Device,” is in evidence as plaintiffs’ exhibit 33. The pertinent portions of this report are as follows:
1. The Ford Truck purchased by the Quartermaster Corps for the Field Artillery was at Mr. Hipkins’ garage in Port Deposit, Md., a few days ago. * * *
2. The new model Hipkins track with chain instead of cable for connecting the shoe plates, was tried out at the Proving Ground and worked very satisfactorily. The plates are about two inches wider than on the previous device tested, to fit the new type dual wheels which have more dish than the former ones and hence more space between the tires. * * *
3. Mr. Hipkins called my attention to the fact that the present weight of tracks could probably be reduced by a third if forged steel shoes were used instead of cast iron. It was too expensive for him to provide the forged shoes and links for a single unit. * * *
12. Plaintiffs’ exhibit 31 is the first Government report dealing with a test of the Hipkins traction device at Aberdeen Proving Ground. It is entitled “First Partial Deport on Test of Ford 1%-Ton Truck Equipped With the Hipkins Traction Device,” the test being made in the period September 14-23, 1931. This report indicates that one of the objects was the determination of tractive ability of the Ford truck mider adverse road conditions, with and without the Hipkins traction device. The report is quite extensive in character and contains numerous calculations, data, and photographs. It also refers to tests of the Hipkins traction device made during the period June 26-July 8, 1931, and July 10, 1931. This report indicates a total test period of 12 days.
*728 This report, which was signed by Major Sears, of the Ordnance Department, Chief Proof Officer of the Automotive Testing Division, and which was approved by Colonel Shinkle, of the Ordnance Department, Commanding, recommends, with reference to the Hipkins device:
(b) That the Hipkins Traction Device be included as part of the equipment of the “Ford Prime Mover for 75-mm. Artillery.”
Hipkins recalls that in the early fall of 1931 he demonstrated one of his traction devices to Major General Bishop, Chief of Field Artillery, at Aberdeen Proving Ground, and that General Bishop verbally indicated that he was favorably impressed. General Bishop died prior to the trial of this case.
period “b”
13. On April 14, 1932, the Plipkins Traction Device Company at Port Deposit, Maryland, was incorporated under the laws of the State of Maryland by Cecil Clyde Squier, one of the original petitioners in this case, who is now deceased, and the present plaintiffs, Otho F. Hipkins, Conrad Keid, J. Thomas C. Hopkins, Jr., and Isaiah Lawrence Paxton.
The certificate of incorporation of the Hipkins Company is in evidence as plaintiffs’ exhibit 9 and includes as some of its objects the following:
A. To purchase, manufacture and sell a certain improved device pertaining to motor trucks and vehicle wheels, covered by United States letters patent, known as “The Hipkins Traction Device.”
B. To purchase the patent rights acquired under and by said letters patent. * * *
C. To manufacture, purchase, sell and otherwise deal in motor trucks and vehicles, road construction and farm machinery and all parts thereof or accessory thereto * * *.
A major purpose of the Hipkins Company was to sell traction devices to the Government and others.
14. On May 12, 1932, Hipkins assigned to the Hipkins Traction Device Company his entire right, title, and interest in United States patents 1,600,588 and 1,600,589 which he then owned. These patents pertain to traction devices.
*729 Hipkins was president of the Hipkins Traction Device Company from the date of its incorporation until February 23, 1939, when the Governor of the State of Maryland by proclamation annulled the charter of the company for nonpayment of State taxes. On August 22, 1934, the Hipkins Traction Device Company granted to the Lukens Steel Company an exclusive license until December 31, 1945, to make, use, and sell traction devices and parts therefor throughout the United States, its Territories and possessions, reserving to the Hipkins Traction Device Company the right to manufacture and sell not exceeding 3,000 sets of traction devices to the United States Government. The license agreement, which involved payment of royalties to the Hipkins Company, included several patents and patent applications, among which were Hipkins patents 1,600,588 and 1,600,589. This license agreement is in evidence as plaintiffs’ exhibit 14.
On the same date (August 22, 1934) and pursuant to a clause in the above-mentioned license agreement, the Lukens Company assigned all its right, title, and interest to such license agreement to the By-Products Steel Corporation of Coatesville, Pa. This license agreement remained in effect until about March 1938. Royalties were paid to the Hipkins Company during this period at the rate of 10 to 20 percent of the net selling price.
15. From October 1934 to December 1935 Otho F. Hipkins was employed on a full-time basis by the By-Products Steel Corporation at an annual salary of $3,250. During this period of employment Hipkins did not demonstrate any traction devices or make any tests for the Government.
Hipkins was on a salary basis as president of the Hipkins Traction Device Company from the date of its incorporation until he went with the By-Products Steel Corporation. In Hipkins’ signed application and personal history statement filed with the War Department on March 24, 1941, a copy of which is defendant’s exhibit 86, Hipkins listed an annual salary of $2,500 from the Hipkins Company.
There is no evidence that Hipkins at any time performed any services or incurred any expense in connection with demonstrations or tests relative to traction devices for the Government during the period subsequent to Hipkins’ leav *730 ing the By-Products Steel Corporation and until he reentered the employment of defendant on August 1,1936.
The last directors’ meeting of the Hipkins Company was held in June 1936.
There is no evidence that any one of the plaintiffs, other than Hipkins, or anyone representing the Hipkins Company other than Hipkins, at any time performed any services or incurred any expense in connection with tests and demonstrations of traction devices for the Government.
16. During period “B” the defendant, through the Quartermaster Corps of the Army, entered into seven separate written supply contracts with the Hipkins Company for the procurement of traction devices. These contracts are in evidence and the following tabulation shows as to each of the identified contracts: its exhibit number, contract number, date, the number of sets of traction devices which it procured, the unit cost thereof, and the total cost of the traction devices:
Contract number Contract date Unit (sets) Unit cost Total cost Plaintiffs’ exhibit No.: 27__________________ 10.................. 11.................. 28.. 29.. 12. 13-Grand total. W398-QM-2846... W398-QM-3481... W398-QM-3697... W398-QM-3766— W398-QM-3994... W398-QM-4880... W398-QM-5420— May 26,1932 Apr. 26,1933 May 27,1933 June 14,1933 Dec. 6,1933 May 8,1936 June 27,1936 7 2 108 20 1 482 $207.60 150.00 135.00 135.00 270.00 75.00 49.81 49.40 38.50 $1,462.50 300.00 14,680.00 [ 3,375.00 75.00 [23,827.20 3,388.00 708 46,997.70
All of these contracts contained Standard Government Contract Article 3, reading as follows:
3. Extras. — Except as otherwise herein provided, no charge for extras will be allowed unless the same have been ordered in writing by the contracting officer and the price stated in such order.
The Hipkins Company delivered to defendant all of the traction devices called for in the above contracts and duly received in full the sums of money called for in the contracts as shown in the above table in full payment for the traction devices.
17. Subsequent to the incorporation of the Hipkins Company on April 14,1932, further tests were made on traction *731 devices obtained from Hipkins and the Hipkins Company, and the following governmental test reports, which are in evidence, were made on the indicated dates:
Source of report Plaintiffs’ exhibit No. Aberdeen Proving Ground-Field Artillery Board_______ Fort Sill..................... Fort Benning.............. Field Artillery Board_______ Field Artillery Board....... Aug. 30,1932 Feb. 15,1933 July 1,1933 July 6,1934 May 15,1936 Oct. 27,1936 32 36 37 38 40 41
The report of August 30, 1932 (plaintiffs’ exhibit 32) is entitled “Second Partial Report on Hipkins Traction Device.” This report indicates that this test was held for a period of five days, namely, June 14-18, 1932, and that it was conducted on the latest type of Hipkins track lent for the purpose of the test by Mr. Hipkins. This test, which was to determine the durability of the traction device and determine its effect on the tires of the truck, was favorable, in that it recommended that the Hipkins traction device should be a part of the equipment of Light Prime Movers in which cross-country ability is a factor.
The remaining test reports are voluminous in character and it is unnecessary to consider them in detail except to state that as the tests progressed they suggested from time to time various changes in the details of the Hipkins structure, such as modification of the guides or arches on the traction shoes and some method other than removal of complete links in order to compensate for changes in the size of the tires and the traction device due to wear. An alteration of the traction device was also suggested, it being found (test report, plaintiffs’ exhibit 40) that when installed in oval form on tandem wheels, the chains connecting the individual shoes permitted them to turn to the side in the space between the wheels.
The last test report (plaintiffs’ exhibit 41) relates to a test on a new type coupling device submitted by the Hipkins Company. This coupling device was for the purpose of taking up wear and adjusting the traction device properly to the wheels of the vehicle. This test report suggested modification, both in the coupling device itself and in the special tool for applying it.
*732 The story told by the various test reports over the entire period is the familiar one that goes with the development of any mechanical device of this character. Failures of various component parts of the traction device and their subsequent redesign could only be shown by actual tests under various conditions. Such tests inured to the benefit of the Hipkins Company as well as the Government.
18. During the period from May 1, 1930 (the date of the first alleged meeting with Major Wallace), to October 1934 (when Hipkins entered the employment of By-Products Steel Corporation), Hipkins made a number of trips to Government installations located along the Eastern Seaboard from Maryland to Georgia, generally pursuant to requests of Army officials. One example of such a request was Hipkins’ trip to Fort Bragg as the result of a letter of August 8,1932, from Major Wallace to Hipkins, the last paragraph of which is quoted here:
From the tenor of Colonel Murray’s remarks it would appear, if you can find time to do so, that a trip to Bragg to witness the use of the tracks on the vehicles might be beneficial to both of us. If you can arrange to go, please notify me so that we may make arrangements for a special test and for your accommodations while at Fort Bragg.
Throughout this period Hipkins and the Hipkins Company planned to sell their traction devices to the Government and in fact did sell such devices, of the approximate value of $47,000, to the Government.
Hipkins’ plan in the early 1930’s was “to develop traction devices that might be sold to the United States Government.” Hipkins invited and welcomed requests to demonstrate traction devices at any time. This is exemplified by a letter of the Hipkins Traction Device Company to the purchasing and contracting officer at the Holabird Quartermaster Depot, which letter is included in the contract file (contract dated December 6, 1933, plaintiffs’ exhibit 29). This letter, after discussing various advantageous features of the Hipkins traction device made the subject matter of this contract, closes with the following paragraph:
All of the above and many other desirable features are built into the Hipkins Traction Device which we will *733 be glad to demonstrate at any time that you request. Thanking you for the invitation to bid and assuring you of our desire to cooperate with you at all times.
19. Referring to period “A,” which relates to personal services and expenses allegedly incurred by plaintiff Hipkins in the demonstrations and tests, Hipkins kept no record of either the time or expenses involved. He now estimates that he carried on such demonstrations and tests once or twice a week as the result of telephonic requests from Aberdeen or Camp Holabird. He never presented any vouchers or claims for expenses or services.
As to period “B,” following the incorporation of the Hip-kins Company, in any demonstrations made by Hipkins for the Government he was acting as a representative of the Hipkins Company. During this period records of expenses and costs were kept by the company, but such records have all either been lost or destroyed.
20. There is no satisfactory evidence of any actual monetary expenditure by Hipkins or the Hipkins Company in connection with any planning and development of traction devices suitable for use on wheels of motor vehicles or trucks, during the entire period from September 30, 1926, when Hipkins left the employment of the Government, to October 1934, when he entered full-time employment of the By-Products Steel Corporation, and any tests and demonstrations on behalf of the Hipkins Company ceased.
Nor is there any satisfactory evidence of expenses incurred by Hipkins or the Hipkins Company pursuant to any verbal or other instructions of officers of the Ordnance Department of the Army or of any representative of the Government having authority to bind it for the cost of such expenses.
21. Any claim for personal services rendered and expenses incurred by plaintiff Hipkins as an individual is a cause of action that accrued to him by April 14, 1932, the date of incorporation of the Hipkins Company. Such claim, if any, was barred by April 14, 1938, by operation of the statute of limitations (28 U. S. C. 2401,2501).
Any claim by the Hipkins Company for services performed and expenses incurred between April 14, 1932, the date of its incorporation, and October 1934, when Hipkins was em *734 ployed by the By-Products Steel Corporation and demonstrations and tests on behalf of the Hipkins Company ceased, accrued on this latter date (October 1934) and therefore was barred in October 1940 by the statute of limitations.
PART TWO OP THE REEERRED BILL

Unauthorized Use of the Inventions of Hipkins and the Hipkins Company

22. In that portion of the referred bill relative to unauthorized use, reference was made to three patents, Nos. 1,600,588, 1,600,589, and 2,008,210. The first two patents were assigned by Hipkins to the Hipkins Company on May 12, 1932 (see finding 14). On June 16,1952, plaintiffs filed a motion to dismiss the petition as to these two patents, and pursuant to such motion and an order issued by the Court on July 15, 1952, relative thereto, they are no longer a part of the case (see finding 2).
The only remaining patent in suit is Hipkins patent No. 2,008,210, application for which was filed in the Patent Office August 12,1933, the patent issuing thereon on July 16, 1935, both of these dates being within the life of the Hipkins corporation. Hipkins has been the owner of this patent since its issue, and the parties have stipulated and agreed “That Hipkins at no time assigned to the Hipkins Company, or otherwise, title to or any interest in the patent in suit No. 2,008,210.” (See stipulation of facts No. 9, paragraph 9.)
A copy of this patent (plaintiffs’ exhibit 51) and a copy of the Patent Office file wrapper and contents thereof of the Hipkins application which materialized into this patent (defendant’s exhibit 30) are made a part of this finding by reference.
23. Patent No. 2,008,210 is entitled “Traction Device.” As originally filed it contained various forms of structural claims, and the specification recites several different objects of the invention. However, when the patent was issued the patent monopoly as expressed by the claims, five in number, was specifically limited to structural features of an adjustable coupling shoe by means of which the length of the trac *735 tion device around the periphery of the wheel or wheels could be adjusted.
The only object set forth in the specification of this patent that is material here, insofar as claims of the patent are concerned, reads as follows:
A further object is to provide a device which utilizes a coupling shoe that connects the ends of the shoe assembly, the nature of the connection of the chain sections to the coupling shoe being such as to provide for a limited amount of adjustment on the shoe by simply reversing the positions of the shoe blocks to which the ends of the chains are attached.
24. In order to make clear the construction herein involved, several of the figures of the patent are reproduced herewith. In Figs. 1 and 3 this traction device is shown as applied to a wheel having the customary dual tires, the treads being spaced apart from each other in order to form an open space
in between the same.

*736 As shown in Fig. 1, the traction device consists of a plurality of traction shoes comprising rectangular plates of more or less flat character with a channel formation so that the outwardly extending sides may bite into the ground and give added traction. As shown in Fig. 1, this series of traction shoes, all of which are identical with the exception of the adjustable coupling shoe, is indicated by reference character 13. Fig. 1 is indicative of the arrangement and location of the traction shoes around the periphery of the dual tread, the outer tread not being shown in order to more clearly illustrate the maimer in which the traction shoes are fastened together.
As shown, each shoe is connected to the adjacent shoe by means of short pieces of chain links similar in structure to a bicycle chain. The chain between each shoe is provided with what is termed an offset link, this being a disconnecting link held in place by a cotter pin so that the lengths of chain may be shortened or lengthened by the removal or the addition of links or shoes to enable the device to fit various sized tires.

25. Fig. 3 is a cross-section of one of the traction shoes shown at a position resting upon the ground and extending across and beneath the treads of the two tires. In order to prevent the device from moving sideways and off of the dual tires, each traction shoe has an integral, inwardly projecting member 32 which acts to approximately center the traction shoes between the dual treads and to keep them in this position.
*737 26. The coupling shoe upon which the claims of this patent are based is shown best in Fig. 8 in cross-section. It consists of a rectangular plate having ground-engaging ridges and generally similar in shape to the other traction shoes. This plate is provided with two circular openings near each edge thereof, these openings being in the plane of the chain extending peripherally around the space between the dual tires, which chain couples the various shoes together.

A rectangular block 41 has a threaded stud 42 which is inserted in each of these openings and which is held in place by a hexagon nut 43. A yoke-like member straddles the upper or inner end of each of the blocks 41 and is attached to the blocks 41 by means of pins 46 which are held in position at their outer ends by means of a conventional cotter pin. The chains coming from the adjacent shoes on each side of the coupling shoe are pivotally connected to the yoke members by pivots 48.
The manner by which adjustment is obtained lies in the fact that the dependent threaded studs are each offset from the symmetrical center of the blocks 41. If in such a construction it is now contemplated that the left-hand chain-connected yoke member 44 is disconnected by the removal of pin 46; the yoke member lifted off of the block; the hexagon nut 43 on the left-hand stud then loosened; the block 41 then rotated 180°; and the chain-connecting yoke *738 member then replaced, the peripheral connecting chain will then be tightened by an amount equal to twice the distance that the stud is offset from the center of block 41.
If now it is contemplated that the right-hand block is similarly disconnected and also reversed 180°, the peripheral chain will be again tightened an equal amount, assuming that the offset distance of the studs from the center of the adjusting blocks 41 is similar.
This coupling shoe therefore permits of three adjustments :
(1) with both blocks in the position as shown in Fig. 8;
(2) with one block reversed 180°;
(3) with both blocks reversed 180°.
27. The claims in suit are as follows:
1. In a traction device, the combination with a wheel having a dual tread, of a plurality of shoes disposed around the tread, one of the shoes being a coupling shoe, chain sections disposed in the groove between the treads connecting adjacent pairs of shoes, and a pair of blocks mounted on the inner surface of the coupling shoe, each having a stud extending through the shoe to receive a securing nut on the end thereof, a pair of chain sections secured to the blocks, and the axis of each stud being offset from the vertical center line through the associated block whereby the length of the device may be adjusted by reversing the position of one or both blocks.
_ 2. A coupling shoe for a vehicular traction device consisting of a plurality of shoes and a connecting chain comprising a pair of spaced blocks mounted on the inner surface of the shoe, studs extending through the shoe and offset from the vertical center line through the associated blocks, the ends of the chain being connected to the blocks and the length of the device being adapted for adjustment by reversing the position of one or both blocks.
3. A coupling shoe for a vehicular traction device consisting of a plurality of shoes and a connecting chain comprising a pair of spaced blocks mounted on the inner surface of the shoe, studs projecting through the base of the shoe with their axes offset respectively from the vertical center lines of the associated blocks, a yoke member to which one end of the chain is secured straddling *739 each block, and a pin passing through each block and the straddling arms of the yoke, the length of the device being adjustable by reversing the position of one or both blocks.
4. In a traction device, the combination with a wheel having a dual tread, of a plurality of shoes disposed around the tread, one of the shoes being a coupling shoe, flexible members disposed in the groove between the treads connecting adjacent pairs of shoes, and a pair of blocks connected to the coupling shoe, the point of connection of each block being onset from the center thereof and one of the flexible members being connected to each block, whereby the length of the device may be adjusted by shifting one or both blocks about its or their points of connection to the shoe.
5. A coupling shoe for a vehicular traction device consisting of a plurality of shoes and attaching means connecting the shoes together comprising a pair of blocks connected to the shoe, the point of connection of each block being offset from the center thereof and the ends of the attaching means being connected to the blocks, whereby the length of the device may be adjusted by shifting one or both blocks about its or their points of connection to the shoe.
28. Each of the five claims of the patent above enumerated specifies “a pair of blocks,” that is, two blocks, and requires that they be separately adjustable. In this respect claims 1,2, and 3 specify that the length of the device is adjustable by “reversing the position of one or both blocks,” and claims 4 and 5 specify that the length of the device may be adjusted “by shifting one or both blocks about its or their points of connection to the shoe? Claims 4 and 5 further specify that the point of connection of each block is “offset from the center thereof? [Italics supplied.]
THE ALEEGED INFRINGING STRUCTURE
29. It has been stipulated that defendant, through the Office of the Chief of Ordnance, War Department, entered into the following contracts with Alliance Engineering, Inc., of Alliance, Ohio, on the dates set out below, each of such contracts, including all amendments thereof, being attached *740 thereto and hereinafter referred to by the exhibit numbers set out below:
Exhibit Apr. 30,1943 Dec. 10,1943 Jan. 10,1944 Jan. 10,1944 Jan. 26,1945 Plaintiffs’ 2. Plaintiffs’ 3. Plaintiffs’ 4. Plaintiffs’ 5. Plaintiffs’ 6. Contract W 303 Ord-5413_____ W 33-019 Ord-667___ W 33-019 Ord-976... W 33-019 Ord-977... W 33-019 Ord-3369..
Pursuant to each of the Alliance contracts, which are in evidence as plaintiffs’ exhibits 2 to 6, Alliance Engineering, Inc., manufactured, sold, and delivered to the defendant traction devices having the construction shown in the drawings which are plaintiffs’ exhibits 1 (a) to 1 (e).
The dates of delivery to defendant of the traction devices procured by the above contracts are shown in the table below, which also shows the cost to defendant for such deliveries:
Contract number Dates of delivery Cost of delivery (including charges for boxing) Plaintiffs’ exhibit W 303 Ord-5413_____ Do............. W 33-019 Ord-667— W 33-019 Ord-976... W 33-019 Ord-977— Do_____________ Do............. W 33-019 Ord-3369-Total_________ Sept. 4, 1943................... Nov. 2,1943 to July 19,1944___ Dec. 14-23,1943_______________ Eeb. 8, 1944, to May 20,1944.. Eeb. 26,1944, to Aug. 24, 1944. Aug. 25, 1944, to Oct. 31,1944.. Nov. 1, 1944, to Mar. 21, 1945.. Eeb. 24,1945, to Aug. 28, 1945. $3,163.14 545,547.50 3,163.14 33,441.12 557,085.32 567,140.30 1,038,392.05 1,017,897.00 3,765,829.57
30. All of the traction devices purchased and delivered to the United States under the above-listed contracts, and which devices are hereinafter referred to as the accused device, are similar in construction. For the purpose of illustrating the structure of this device, plaintiffs’ exhibits 1 (b), 1 (c), and 1 (d) are reproduced herewith.

*741

*742 Plaintiffs’ exhibit 1 (d) shows the application of the accused device to a wheel construction having dual-tread tires. The traction device consists of a plurality of rectangular shoes located about the periphery of the tires and held in place by a flexible connecter consisting of a link chain located within the space between the dual treads. Each shoe is formed of a base having outwardly projecting ground-engaging cleats or ribs which extend transversely of the shoe adjacent its leading and following edges.
Plaintiffs’ exhibit 1 (b) is a view at right angle with the plane of the wheel and showing the position of the bottom shoe when in contact with the ground. This figure also shows an inwardly projecting guard and guide mechanism for protecting the chain-adjusting mechanism and for keeping the traction devices properly centered with respect to the dual tires and preventing chafing of the tires by the connecting links. Each of the traction shoes is provided with this member.
31. Plaintiffs’ exhibit 1 (c) shows the details of the mechanism for adjusting the effective length of the peripheral chain so that it may be adjusted to obtain the desired tightness or looseness of the device when it is mounted on a wheel. In the accused device all of the traction shoes are similar in that each is provided with the adjusting mechanism. The shoe structure is also shown in physical exhibits, defendant’s 88, 89, and 90.

*743 As shown in the figure, the link chains coming from the adjacent shoes on each side enter near the inner surface of the shoe base and then extend upwardly around a pair of fixed rollers, the inner ends of the chains being pivotally fastened to an internally threaded block. This block is mounted upon a threaded bolt which extends inwardly and is vertical to the plane of the traction shoe. The outer end of this bolt, which protrudes through to the exterior surface of the shoe, is provided with a hexagon end to which a socket wrench may be applied for turning the bolt. The inner end of this vertical bolt is rotatably mounted in the inwardly projecting guide carried by the shoe.
When the bolt is turned, this causes the block to move upwardly or downwardly on the bolt with respect to the traction shoe. When moved upwardly, the inner ends of the connecting chain move around the fixed rollers and are thus pulled inside of the guard or guide, thus shortening the effective length of the chains. The reverse takes place when the block is moved downwardly toward the shoe, such movement lengthening the effective length of the chains. The internally threaded block that is mounted for movement along the bolt or stud is symmetrical in shape.
32. The adjusting mechanism of the accused device does not have a pair of blocks (two blocks) mounted on a traction shoe nor is the single adjustable block of the accused device offset in any way from its center of connection to the shoe. Instead, it is symmetrical in form, and the axis of the block and its adjusting screw coincide.
The accused device does not have two studs extending through the shoe with the axis of each offset from the corresponding block, and the link or block in the accused structure is not adjusted by reversing its position or by shifting one or both blocks about their points of connection to the shoe. The only normal movement of the block in the accused device during any adjustment is a straight line movement axially of its supporting screw. The accused device provides for an infinite number of adjustment positions as the block travels along the screw, whereas in the Hipkins construction with *744 the offset blocks, only three adjustment positions are provided.
33. The phraseology of the claims of Hipkins patent No. 2,008,210 is not applicable to the accused device, and there is no infringement of this patent by the accused device.
PRIOR ART
34. There are only two prior art patents of interest in connection with Hipkins patent No. 2,008,210. They are as follows:
Hipkins patent No. 1,600,589, issued September 21, 1926 (plaintiffs’ exhibit 50);
British patent to Kennedy No. 385,747, which has a sealing date (patent date) in Great Britain of March 23, 1933 (defendant’s exhibit 45).
35. During the prosecution of the application in the Patent Office which matured into Hipkins patent No. 2,008,210, the examiner rejected certain pending claims on Hipkins’ prior

patent No. 1,600,589, and particularly Fig. 8 thereof, which is reproduced above. The structure shown there generically resembles that of the Hipkins patent in suit, consisting of a traction shoe having four openings therein through which a dependent bolt, from the end of the flexible member which connects the various traction shoes around the periphery of the tire, may be inserted. A nut on the end of the inserted bolt holds it in place. By means of such structure either the outer bolt holes may be used, an inner or outer bolt hole used, or the two inner bolt holes used, thereby giving three different adjustments of the peripheral flexible member which connects the traction shoes together.
*745 After this patent was cited by the Patent Office, Hipkins amended his claims to limit them to the present form having blocks with offset studs and adjusting the length of the chain or coupling device by reversing the position of the blocks or shifting one or either of them about the points of connection to the shoe. With the claims thus narrowed as indicated in the file wrapper (defendant’s exhibit 30), they are not anticipated by this earlier patent to Hipkins.
36. The British patent to Kennedy relates to a series of coupling shoes forming a traction device used on a single tire. Such structure has a flexible chain located on each side of the tire and coupling shoes. The ends of the chains each side of each coupling shoe terminate in a conventional

oblong chain link. As shown in Figures 1 and 2 of the Kennedy patent reproduced below, two oblong blocks are provided which may be inserted in the oblong links. Each of these blocks is provided with a hole offset from the symmetrical center of the block, these holes being adapted to *746 register with holes in the coupling shoe through which a bolt may be inserted, as shown in Figures 3 and 4. By reversing either of the blocks end for end, or by reversing both blocks, three different adjustments of the chain length may thus be obtained. The oblong chain links are held in place over the oblong blocks by means of a recessed cover plate fitting over the chain links and held against the exterior surface of the coupling shoe by means of the bolt and a cooperating nut which holds the oblong blocks in assembled relationship with the coupling shoe.
37. The phraseology of claim 5 of the Hipkins patent No. 2,008,210 is directly readable upon the structure of the British Kennedy patent just described, and this claim is therefore invalid. Claims 1, 2, and 4 differ from the Kennedy structure only in that they relate to a traction device on a wheel having a dual tread with the connecting device or chain located in the space between the dual tires rather than at the side of the tires. It would not require the exercise of inventive ingenuity to merely change the location of the connecting chain from the side of the traction shoes on a single tire to the space between the dual tires, especially in view of the disclosure of the prior art patent No. 1,600,589, and these claims are therefore also invalid.
Claim 3 is more limited in scope, including “a yoke member to which one end of the chain is secured straddling each block, and a pin passing through each block and the straddling arms of the yoke.” Such structure is not found in the British patent to Kennedy, and this claim is valid.
38. The Government has not used any of the inventions forming the subject matter of the five claims of Hipkins patent No. 2,008,210.
EXPLANATORY NOTE
The findings up to this point relate to that part of the petition requiring a report to the House of Representatives in accordance with H. R. 5243. In addition, the petition requests a judgment of this Court on (1) an implied contract for manufacture and use of the alleged inventions of the three patents in suit, which is presented under 28 U. S. C. 1491; and (2), in the alterna *747 tive, a claim for patent infringement or unauthorized use, which is presented under the act of June 25, 1948, as amended (28 U. S. C. 1498). These findings follow.
THE IMPLIED CONTRACT

Hipkins patents 1,600,688 and 1,600,689

39. This is a claim for alleged authorized use of the inventions covered by the three Hipkins patents in suit in connection with traction devices procured by the Government other than from the Hipkins Company. More specifically, the traction devices here in issue are those purchased by the Government under the five contracts with the Alliance Company which are listed in detail in finding 29.
40. The plaintiffs primarily base the implied contract upon a conversation between Hipkins and Major Wallace some time in May 1930. Hipkins alleges that in this discussion a verbal understanding was reached that the Government would either adopt the Hipkins traction devices and purchase them from Hipkins or enter into a license agreement under certain of the Hipkins patents, viz., the three patents in suit.
As set out in detail in finding 8, Major Wallace died prior to the trial of this case, and there is no evidence that corroborates Hipkins as to his understanding with Major Wallace, nor is there any evidence that Major Wallace had any authority to bind the Government by any contract, express or implied, for the purchase of any Hipkins traction devices.
41. Plaintiffs also apparently rely upon a conversation between Hipkins and General Bishop, Chief of Field Artillery, in the early fall of 1931, at a demonstration of one of the Hipkins devices before General Bishop. Hipkins5 recollection of the verbal statement made by General Bishop at the conclusion of the tests was that the General stated “that he was thoroughly convinced and satisfied that the use of my traction device on the wheels of a commercial vehicle did materially increase its cross-country mobility, and that there wasn’t any question in his mind but what it could be considered as satisfactory as a light prime mover and a cargo vehicle for light Field Artillery purposes.” General Bishop *748 is deceased, and there is no corroboration of the above statement, which is merely commendatory in character.
There is no evidence that General Bishop had any contractual authority to bind the Government by any contract, either express or implied.
■ 42. There is no evidence in the record that any Government agent, with authority to bind the Government contractually, guaranteed Hipkins that his device would be purchased in quantities other than those specified in the seven contracts entered into by the Government and the Hipkins Company and referred to in detail in finding 16.
43. On April 14, 1932, the Hipkins Traction Device Company was incorporated (see finding 13) and on May 12,1932, Hipkins assigned to this company his entire right, title, and interest in the two patents in suit 1,600,588 and 1,600,589. Thereafter, the only interest Hipkins had in these two patents was as a stockholder and officer of the Hipkins Company.
On August 22, 1934, the Hipkins Traction Device Company granted to the Lukens Steel Company an exclusive license until December 31, 1945, to make, use, and sell traction devices. This license agreement, described in detail in finding 14, included the two patents 1,600,588 and 1,600,589.
The only exception to this exclusive license agreement was a reservation by the Hipkins Company to manufacture and sell no more than 3,000 sets of traction devices to the Government.
44. The last directors’ meeting of the Hipkins Company was held in June 1936 and Hipkins reentered Government employment on August 1, 1936. There is no evidence showing any activity on the part of the Hipkins Company after this date.
On February 23,1939, the Governor of the State of Maryland by proclamation annulled the charter of the Hipkins Company for nonpayment of Maryland State taxes. From February 23, 1939, to date the Hipkins Company has been out of business.
The accused devices upon which this phase of the case is based were delivered to the Government under a series of contracts with Alliance Engineering, Inc., the dates of the contracts extending from April 30,1943, to January 25,1945, *749 these dates, together with the dates of delivery, being tabulated in finding 29.

HipMns patent 2ft08$10

45. Hipkins has been the sole owner of this patent since its issue, and the parties have stipulated that Hipkins at no time assigned to the Hipkins Company, or otherwise, title to or any interest in this patent. The facts surrounding the alleged use of the inventions covered by this patent are set forth in detail in the first phase of this case in findings 22 to 38, inclusive, and it is unnecessary to again refer to them in detail except to call attention to the ultimate finding, 38, reading as follows:
The Government has not used any of the inventions forming the subject matter of the five claims of Hipkins patent No. 2,008,210.
46. At the pretrial conference before the Commissioner held November 5, 1951, plaintiffs amended their petition as follows:
Plaintiffs will not contend or urge upon the Court that any of the claims in either of the three patents in suit cover the guide or guard referred to in paragraphs 14 (a), (b) and (c) on pages 12 and 13 of the Petition and on pages 14 and 15 of Appendix B, but plaintiffs do contend and will urge upon the Court that said guide and guard should be considered in connection with their claim under the alleged implied contract between plaintiffs and defendant.
This U- or V-shaped guide, or guard member, as shown in Fig. 3 of Hipkins patent 2,008,210, finding 24, extends inwardly into the space between the dual pneumatic tires, serves as a shield and prevents chafing of the tires by the flexible connecting member between the shoes, and prevents lateral shifting of the shoes with respect to the dual tires, thus keeping the traction device properly centered. This part of the accused device is shown in the illustration, “plaintiffs’ exhibit 1 (b),” contained in finding 30.
47. A device of this nature, similar both in character and function, is disclosed in the patent to Barnes et al., No. 1,931,522, issued October 24, 1933, on an application filed *750 November 26, 1930, and in evidence as defendant’s exhibit 70. (Hipkins patent No. 2,008,210 matured from an application filed in the Patent Office August 12, 1933.) Fig. 5

of the Barnes patent is reproduced herewith, the inwardly projecting guide identified by the reference character 22 being shown as projecting into the space between the dual tires. An actual physical embodiment of the Barnes traction device was built for the Government in the shops of Watertown Arsenal, Massachusetts, prior to April 9,1930, and this set of tracks was carried as equipment on a vehicle which left Water-town Arsenal on April 9, 1930, under its own power for the Aberdeen Proving Ground, arriving there on April 11,1930.
A series of photographs of this traction device is attached to a report of tests made at Aberdeen Proving Ground during the period April 15 to August 2, 1930, which report is in evidence as defendant’s exhibit 85.
The specification of the Barnes patent just discussed states in its opening paragraph that—
The invention described herein may be manufactured and used by or for the Government for governmental purposes, without the payment to us of any royalty thereon.
48. The guide features as disclosed in the Barnes patent were known to and in use by the Government prior to the date of conception of this feature asserted by Hipkins in the petition (14 (a), (b), (c)) as shortly subsequent to the tests made at Fort Bragg, North Carolina, on August 16, 1932.
CLAIM FOR UNAUTHORIZED USE
49. When this case was originally presented, this phase of the case covered the three patents in suit. However, as stated *751 in finding 2, after proof was closed plaintiffs withdrew patents 1,600,588 and 1,600,589 from the case insofar as unauthorized use was concerned, thereby leaving only the Hipkins patent 2,008,210 for consideration under Title 28, U. S. C. 1498. The unauthorized use of this patent has already been fully covered in the first phase of this case in findings 22 to 38, inclusive, and it is unnecessary to again review these facts in detail.
50. As to any just and reasonable compensation under an implied contract or use of the plaintiffs’ inventions, the petition in paragraph 32 states that plaintiffs are unable to state the sum due them but at an appropriate time, when the amount is ascertained, they will file an amended petition setting forth the sum due them by the defendant. Such amended petition has never been filed and no testimony has been taken on the accounting phase of this case.
The foregoing findings of fact, opinion and recommendation will be transmitted to the House of Representatives, in accordance with the act of March 3, 1911, 36 Stat. 1087, as amended by the act of June 25,1948, 28 U. S. C. 1492, 2509.